**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

W.G. ANDERSON, ET AL.			CIVIL  NO.  02-2168-S

VERSUS					JUDGE S. MAURICE HICKS, JR.

UNITED STATES				MAGISTRATE JUDGE HORNSBY

**AMENDED MEMORANDUM RULING**[1]

This is an action for refund from the Internal Revenue Service ("IRS") filed by W.G. Anderson and H.F. Anderson, acting as co-executors of the Estate of Mrs. Gertrude Anderson ("Estate").  The Estate seeks recovery of an overpayment of estate and gift taxes, related interest, administrative expenses and attorneys' fees, alleged by the Estate to have been erroneously and illegally assessed and collected by the United States through the Internal Revenue Service ("IRS") in 1997.

**BACKGROUND**

Mrs. Gertrude F. Anderson died testate on February 3, 1997.  On November 3, 1997, the Estate timely paid to the IRS estimated estate and gift tax in the amount of $14,600,000 and timely filed an Application for Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes.  The Estate timely filed its United States Estate (and Generation-Skipping

---

[1]This memorandum ruling is being amended for the limited purpose of correcting the name of the rebuttal expert Shannon Pratt.  In the original memorandum ruling (Record Document 56), this Court erroneously referred to Shannon Pratt as Carl Pratt.

Transfer) Tax Return (Form 706) (the "Return") on March 21, 1998, declaring a total gross estate of $38,229,629; a taxable estate of $34,650,732; and a net estate tax (and total transfer tax) of $14,598,985. The prior payment of $14,600,000 by the Estate was applied to the Estate's tax liability as calculated in the return, leaving an overpayment by the Estate of $1,015.

The return was selected by the IRS to be examined and audited. Ultimately, the IRS contested the fair market values stated in the Return for certain assets of the Estate and issued an "Unagreed Report" dated February 20, 2001, to that effect. On March 8, 2001, the IRS issued a Statutory Notice of Deficiency ("Notice of Deficiency") claiming that the Estate owed $3,052,566 in additional estate taxes, plus interest from the due date of the return. On May 31, 2001, the Estate timely paid, under protest, the additional federal estate tax due under the Notice of Deficiency. The parties have stipulated to these and other facts and those facts are so found by the Court. The stipulation of facts with accompanying exhibits, is incorporated herein by reference.

The principal amounts remaining in dispute relate to the fair market valuation of the decedent's minority ownership interests in four limited liability companies, namely Anderson Exploration Energy Company, LLC ("AEEC"), The Carthage Partners, LLC ("Carthage"); CDF Partners, LLC ("CDF"); and GMA Energy, LLC ("GMA") (collectively sometimes referred to as the "LLCs"). The parties dispute: (1) the appropriate fair market value of certain mineral interests held by the LLCs and the overall fair market value of the decedent's minority interests in the LLCs; (2) the fair market valuation of various mineral interests

and properties owned by the Estate directly (rather than by the LLCs); (3) the amount of Administrative Expenses properly deductible; (4) interest accrued from the date of payment of the deficiency; and (5) the Estate's claim for attorneys' fees and litigation costs. We will take each of these in turn.

**FINDING OF FACTS**

**I. Value of mineral interests held directly by decedent and by the decedent through her minority interest in the four LLCs.**

This case rests on finding a fair market value for mineral interests. In order to do so, the Court relies on a petroleum engineering expert opinion as to the viability of the decedent's various oil and gas enterprises and holdings. The parties' valuation experts rely on Coutret's mineral reports and analyses to derive the value of the decedent's mineral interests. Given both parties' support of the Coutret reports and having heard and reviewed all of the evidence presented, the Court finds that the mineral valuation provided by Coutret is accurate and is appropriately used as the baseline or benchmark for determining fair market value of the Estate. Using Coutret's estimate of the reserves and production capacities of the various oil and gas properties involved, we now move to valuing the decedent's share of those properties.

**II. Fair market value of decedent's interest in her directly held property and minority interest in the aforementioned LLCs.**

**A. *Prior Rulings***

The Court determined in an earlier ruling that the value of the interests shall be determined using a combination of the net assets approach and the market approach. The net assets approach is to be weighted 2-1 over the

market approach. In calculating the net assets value, the parties shall apply (i) a liquidation cost of 10%; (ii) a minority discount of 10%; and (iii) a lack of marketability discount of 40% to the stipulated starting values. The Court also held that a marketability discount of 40% shall be applied to the values calculated under the market approach to which we know turn our attention.

### B. The Market Approach

Three valuation experts and a rebuttal expert testified in this case. The experts disagree as to the appropriate method of calculating the starting values for the LLCs under the market approach. An analysis under the market approach begins with the selection of publicly owned and traded companies that could be considered "comparable" to the closely held family and privately owned interests at issue. Although the experts relied on different companies to make their calculations, neither party challenged the validity of each other's selections. Finding that there are no perfectly comparable companies for the privately held LLCs in this case, the Court will treat each party's comparables as equally valid. Inherent in each expert's analysis is the difficulty of equating the values of a publicly held corporation with family-held business interests engaged in the exploration and production of oil and gas with all their attendant rules.

#### 1. Financial Measures

The next step in a market approach analysis is to adjust the comparable companies to reflect economic realities of the LLCs in the hopes of arriving at a starting value for the LLCs. The adjustment is made by applying various financial measures to the comparables and the experts in this case have selected different

measures. The estate's expert uses two primary measures: price-to-pretax cash flow and price-to-appraised worth. The Government uses three measures: price-to-cash flow for the last twelve months, price-to-cash flow for the last fiscal year, and price-to-a three year cash flow average. While rebuttal expert Shannon Pratt testified that no significant difference in starting values result from the use of different financial measures, all four experts agree at a minimum that price-to-cash flow is an acceptable way to value an oil and gas company. The Government argues that by including the price-to-appraised worth, as the Estate would have the Court do, the value of the LLCs assets would be unnecessarily double-counted. However, using appraised value in this instance does not unfairly weight the value of assets already counted. Instead, it provides another comparison point between the LLCs and the comparable public companies. Accordingly, the Court finds that using "price-to-appraised worth" is an appropriate measure. Because all experts agree that cash flows are also appropriate measures to reflect the market value of the LLCs, the Court orders the parties to use price-to-cash flow for the last twelve months, price-to-cash flow for the last fiscal year, and price-to-a three year cash flow average, and the price-to-appraised worth in determining starting values for the subject LLCs.

### 2. *Range of Multiples*

The last step in determining value under the market approach involves the use of the financial measures to create a range of multiples which will then be applied to the comparable companies to come up with the LLCs value. The selection of a range of multiples, perhaps more than any other determination or

calculation in this case, is a judgment call by a qualified expert. Both Mr. Thomson (the Government's expert) and Mr. Stryker (one of the plaintiff's experts) selected multiples <u>below</u> the statistical median of the range derived from the comparable companies; however their opinions of how far below the median the multiples should be selected vary significantly.

The Estate and Mr. Stryker adjusted their multiples to the lower end of the range derived from the comparable companies. Based on the LLCs' smaller size, lower operating margins, non-operator status, dependency on thin outside management, history of capital calls, and a pending arbitration, Stryker felt the lower range was more appropriate. In layman's terms, the LLCs are smaller, less diversified, more risky, and have less potential to raise capital than do the comparable public companies. Choosing the actual numbers falls within the specialized knowledge of each expert. Mr. Stryker was an impressive expert witness.

The Government and Mr. Thomson agree with the Estate that the LLCs are smaller and not as diverse as the comparables, and, therefore must be discounted at some percentage. However, the Government believes that the range of multiples should not be as low as the Estate suggests, primarily due to the LLCs' lack of debt, their history of distributions, their profit margins, and their overall good financial condition. To determine his multiple range, Mr. Thomson analyzed acquisition prices for publicly-held versus privately-held companies as reported in a Mergerstat publication. While this method at first blush appears sound, the publication's data was not sufficiently detailed to allow comparison of

the oil and gas industry and small companies we have before us, but was instead a general study of acquisition values in all companies. Because of his reliance on that general data, which the Court finds lacking in specificity, the Court underweights Mr. Thomson's end analysis and places more weight on the analyses of the Estate's experts on this point.

The Estate's rebuttal expert, Shannon Pratt, is perhaps the most credentialed of all experts in the field of business valuation. Throughout his testimony, Mr. Pratt seemed to tread the middle road, using Mr. Thomson's weights on market approach over asset approach, combined with discount rates higher than those selected by Mr. Stryker. Mr. Pratt's methods are well-reasoned and form the basis of nationally recognized reference and text books that provide thorough guidance on the subject of valuation of small businesses. His opinion cannot, therefore, be said to be biased in favor of the Estate. With regard to the selection of multiples, Mr. Pratt takes Mr. Stryker's approach, but also reviews Mr. Thomson's methodology. While preferring the former method, Mr. Pratt suggests that Mr. Thomson's data would have been more reliable if he had used a larger downward adjustment from the median based on the size of the comparables and the LLCs.

Having reviewed the expert reports and listened closely to the testimony and studied the parties additional briefs, the Court finds that Mr. Stryker's range of multiples reflects the more accurate picture of the LLCs and therefore should be used in calculating the LLCs final value under the market approach.

### C. *Conclusion*

This Court finds that, given that the Estate is part of a closely-held interlocking network of family businesses, the Estate's holdings are more likely to be liquidated at some point than sold on the open market. Therefore the Government's expert Thomson's allocation of a 33.3% weighted market approach and a 66.7% weighted net asset approach appears to be a reasonable valuation method.

There are no disagreements about how to apply the net asset approach, however, the experts again disagree as to the proper financial measures to use with the market approach. The Court finds that a combination of price-to-cash flow averages and price-to-appraised worth are the appropriate financial measures for use with evaluating comparable companies. The Court also finds that the range of multiples used by Mr. Stryker are more reflective of the privately-held LLCs when compared to the publicly-held comparables and should be used to establish values under the market approach.

Lastly, the court finds that Mr. Stryker's discount rates (as supported by Pratt) more accurately reflect the realities of the market and these minority interests. Accordingly, the Court finds a marketability discount of 40% is proper for both the market and net asset approaches, and a 10% discount for liquidation costs and a 10% minority discount is proper for the net asset approach.

### III.  Refund amount.

#### A. *Income Tax Refund*

The original IRS deficiency notice stated that estate taxes totaled $14,203,850.00. The IRS' own expert now states the taxes owed are

considerably less: $12,244,000.00. Therefore, a refund will issue for a minimum of $1,959,850. The parties are to use the valuation guides given above to provide the Court with the actual amount of tax refund due the Estate.

### B. *Interest Refund*

The Estate is entitled to a refund of all interest paid to the IRS on May 31, 2001, in connection with the Notice of Deficiency. The amount of such interest refund is dependent on the amount of the tax refund. The parties are to calculate and provide the Court with the actual dollar amount of interest to be refunded.

### C. *Statutory interest from the date of payment of the deficiency*

Pursuant to 26 U.S.C. §6611, the Estate is entitled to payment by the IRS of interest on any amounts that were paid to the IRS by the Estate in connection with the Notice of Deficiency and ordered to be refunded by this Court. Such interest should be calculated by applying the interest rate prescribed in 26 U.S.C. §6621 from May 31, 2001 (the date that such amount was paid to the IRS), through the date that payment of the awarded refund is actually paid to the Estate. The parties are to provide the Court with the actual amount of statutory interest due to the Estate from the IRS because of the taxpayer's overpayment.

### D. *The amount of administrative costs properly deductible*

In calculating the amount of the refund due in this matter, the Estate is entitled to an administrative costs deduction in accordance with 26 U.S.C. 2053. Where the fees were incurred in an action for refund of estate taxes paid *and* the fees were reasonable, attorney's fees are includible administrative costs

including attorney's fees and therefore properly deducted from the gross estate. Deobald's Estate v. US, 444 F.Supp. 374 (E.D.La 1977). The parties are to provide the Court with revised administrative costs, along with the calculations of the new estate value.

### IV. The Estate's claim for attorneys' fees and litigation costs.

The Estate contends that, pursuant to 26 U.S.C. §7430, it is entitled to recover from the IRS the full amount of all reasonable administrative costs incurred in connection with the Refund Claim and all reasonable litigation costs incurred in connection with this lawsuit (including attorney and expert fees) because: (1) the Estate exhausted all administrative remedies available to the Estate within the IRS under the circumstances; (2) the Estate's demand for payment of such costs was timely made; (3) the Estate will substantially prevail in this lawsuit regarding the amount in controversy and the most significant issues presented herein; and (4) the positions taken by the IRS and the United States in connection with the Notice of Deficiency, the Refund Claim and this lawsuit were arbitrary, capricious and not substantially justified.

Given the honest difference of opinions among the various valuation experts, it is not clear that the IRS was not substantially justified in the original tax. In determining whether a position taken by the government is substantially justified, the court must consider whether that position is justified to a degree that could satisfy a reasonable person. "It is not enough that a position simply possess enough merit to avoid sanctions for frivolousness; it must have a 'reasonable basis in both fact and law.'" Bouterie v. Commissioner of Internal

Revenue, 36 F.3d 1361, 1367 (5th Cir. 1994). However, even if the IRS was not substantially justified, the net worth requirement stated in 26 U.S.C. §7430 precludes an award of costs and fees to the estate since the gross value of the estate at the decedent's death was greater than $2 million dollars.

The Estate argues that this net worth requirement is unconstitutional because it is not rationally related to the promotion of any legitimate state purpose, and irrationally and arbitrarily discriminates against the Estate. But, in <u>Richard v. Hinson,</u> 70 F.3d 415, 416-418 (5th Cir. 1995), the Fifth Circuit considered the constitutionality of a similar net worth requirement found in 5 U.S.C. § 504 and found it constitutional. We adopt the reasoning in that case to hold that the net worth requirement in Section 7430 is constitutional. Accordingly, the Estate will not recoup its fees and litigation costs from the IRS.

**IT IS SO ORDERED.**

**THUS DONE AND SIGNED** in Shreveport, Louisiana this 22nd day of February, 2006.

*[signature]*
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE